**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MICHELLE PORTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-02131-TWP-MJD |
| | ) | |
| FRANCISCAN ALLIANCE, INC. d/b/a | ) | |
| FRANCISCAN HEALTH INDIANAPOLIS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND MOTION TO STRIKE SUR-REPLY

This matter is before the Court on Defendant Franciscan Alliance, Inc. d/b/a Franciscan Health Indianapolis' ("Franciscan") Motion for Summary Judgment (Filing No. 48) and Motion to Strike Plaintiff's Sur-Reply ("Motion to Strike") (Filing No. 74).  Plaintiff Michelle Porter ("Porter") initiated this action following termination by Franciscan, asserting claims for race discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  Porter alleges Franciscan subjected her to disparate treatment and a hostile work environment on the basis of her association with her Black husband and biracial children, and retaliated against her for engaging in protected activity, including filing this lawsuit. For the following reasons, the Court **grants in part and denies in part** Franciscan's Motion to Strike and **grants** Franciscan's Motion for Summary Judgment.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Porter as the non-movant.

*See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.     **Porter's Employment with Franciscan**

Porter is a white woman ([Filing No. 21 at 3](#)).  Her husband is a Black man, and their children are biracial.  *Id.*  Franciscan hired Porter in 2008 as a CT Technologist[1] ([Filing No. 48-6 at 6](#)–7).  In August 2010, she began working as a full-time CT Technologist in Indianapolis, Indiana.  *Id.* at 10.  In 2011 or 2012, Porter began working with Cheryl Chandler ("Chandler"), another CT Technologist ([Filing No. 48-7 at 32](#)–33).  Chandler identifies as American Indian and Caucasian, based on her Cherokee ancestry.  *Id.* at 6-7.  Her husband and children are white. Chandler and Porter became friends and socialized outside of work, sometimes with their spouses and children.  *Id.* at 33–34; ([Filing No. 48-1 at 3](#)).  Chandler knew that Porter's husband is Black and that her children are biracial ([Filing No. 48-7 at 39](#)).

In 2017, Chandler was promoted to CT Supervisor and served as Porter's supervisor.  *Id.* at 11–14.  One of Chandler's supervisory responsibilities was completing annual performance reviews.  *Id.* at 21–22; ([Filing No. 48-1 at 3](#)).  Annual performance reviews for CT Technologists are based on two categories: adherence to "the Franciscan Values" (Christian Stewardship, Joyful Service, Fidelity to Franciscan's Mission, Compassionate Concern, and Respect for Life) and performance of job-related duties and competencies ([Filing No. 48-1 at 3](#), ¶ 11).  Both categories carry equal weight in determining an employee's annual review score, with a maximum score of three points ([Filing No. 48-1 at 3](#); [Filing No. 48-7 at 24](#)).[2]  Chandler sometimes gave feedback to

---

[1] CT Technologists perform Computer Tomography ("CT" or "CAT") scans ([Filing No. 48-7 at 9](#)).

[2] Pursuant to Franciscan's Performance Appraisal Forms, the following scores correspond to the following employee performance ratings: 3.0 –Exceeds Standards; 2.5 – Often Exceeds Standards; 2.0 – Meets Standards; 1.5 – Sometimes Meets Standards; 1.0 – Rarely Meets Standards (Needs Improvement) ([Filing No. 60-1 at 23](#), 28, 38).

employees outside of their annual evaluations, but she did not normally do that (Filing No. 48-7 at 28). Chandler scored Porter 2.5 in her 2017 performance review, 2.5 in her 2018 performance review, and 2.7 in her 2019 performance review. *Id.* at 84; (Filing No. 60-1 at 4, 23, 28, 38).

**B.**   **Porter and Chandler's June 2020 Conversation about Black Lives Matter**

In June 2020, Porter and Chandler had a conversation regarding their differing views on the Black Lives Matter protests in Indianapolis in response to the murder of George Floyd (the "BLM Conversation"). Porter mentioned that she planned to participate in the White Coats for Black Lives peaceful protest that was organized for the healthcare workers to support Black Lives Matter, in support of her husband and children (Filing No. 48-6 at 60–62). In response, Chandler expressed her concerns about the possibility of violence at the protest, stating: "why would you want to do that, someone is just going to get shot … I don't want to hear about it, know about it, or see it …. I'm sick and tired of it all, my son is scared to even go outside because he's scared he will get shot." (Filing No. 60-1 at 3; Filing No. 48-1 at 3). Porter explained that it was her duty to attend the protest because "the fear [Chandler's] son was experiencing would eventually go away, but the fear that [Porter's] husband and children experience will never go away because they are black" (Filing No. 60-1 at 3). Porter continued that people who declined to participate in protests "and do nothing are the problem," and Chandler responded, "I'm sorry, I disagree with you. I don't think burning buildings and destroying things is the best way to, you know, mitigate change." (Filing No. 48-7 at 41). The conversation did not end well. *Id.* at 42. Chandler later recounted the conversation to her direct supervisor, Amy White ("Supervisor White"), and Franciscan Director of Imaging, Christina Brocker ("Director Brocker"). *Id.* at 46.

The next morning, Porter was working in the Emergency Department ("ED"). Chandler did not go to the ED like she normally would have because she was upset with Porter (Filing No. 60-1 at 3). Later in the day, though, the two women made up. Porter expressed that she had felt

unsupported by Chandler, and Chandler apologized.  *Id.* at 4; (Filing No. 48-6 at 113–14; Filing no. 48-7 at 42). Porter and Chandler continued to attend social events together in the fall of 2020, including when Porter and her family went to a graduation party for Chandler's daughter in June 2020 and when Porter took senior photos for Chandler's son and photos of Chandler's granddaughter in the fall of 2020 (Filing No. 48-7 at 43–44).

**C.**     **Corrective Actions and Discrimination Complaints**

For a few months, work was relatively uneventful.  But in January 2021, Porter received a poor annual performance evaluation.   Several corrective actions and complaints followed, culminating in Porter's termination in January 2023.

**1.**     **Porter's Performance Evaluation and First HR Complaint**

On January 12, 2021, Chandler delivered Porter's annual performance evaluation for the period of August 1, 2019 to July 31, 2020 (the "2020 Evaluation") (Filing No. 48-1 at 4, 11–15). Chandler scored Porter 1.3 out of 3 because she did not believe Porter had upheld Franciscan's values. *Id.* at 4. Chandler based her evaluation in part on "multiple complaints by co-workers about [Porter's] attitude and behavior during the initial stages of COVID."  (Filing No. 48-7 at 51.) According to Chandler, Porter had expressed frustration with shift changes made in response to the pandemic and with "having to pick up the slack for the pregnant co-workers" who could not care for COVID patients (Filing No. 48-7 at 52). Chandler had an informal discussion with Porter about her attitude but did not provide any formal coaching.  *Id.* at 55, 56.

The 2020 Evaluation concluded that Porter had not upheld Franciscan's "respect for life" value:

> [Porter] needs to work on addressing her frustrations with co-workers in a professional manner without letting her emotions take control. This has been an emotionally challenging year for most of us and the emotional stress of her personal life has carried over into her work life at times.… Remember to have empathy for co-workers and extend grace in areas where you would want grace extended to you

4

if the tables were turned: ex. pregnant co-workers…. Work to maintain a positive

attitude even in adverse circumstances. I.E. this entire year.

(Filing No. 48-1 at 11–12).  Chandler asserts that the 2020 Evaluation "had nothing to do with [the

BLM Conversation], as the conversation was not work-related and [Chandler] did not view it as

negatively affecting [Porter's] job performance in any way." *Id.* at 4.

Porter disagreed with the pregnant co-worker example in her 2020 Evaluation regarding

her Respect for Life and contacted Chandler on January 13, 2021 with a request to remove that

comment. *Id.* at 4; (Filing No. 48-7 at 61).  Chandler discussed the request with Supervisor White

and Co-Worker and Labor Relations Specialist Cathy Rogers ("HR Rep Rogers"), and they decided

to remove the comment but keep Porter's evaluation score the same (Filing No. 48-1 at 4–5; Filing

No. 48-7 at 61–62).  The revised 2020 Evaluation also removed the sentence referring to "an

emotionally challenging year." (Filing No. 48-1 at 17–21.)

In early February 2021, Porter called Franciscan's employee complaint hotline (the "First

HR Complaint") (Filing No. 48-2 at 3).  Porter's complaint was assigned to HR Rep Rogers.  On

February 19, 2021, Porter emailed HR Rep Rogers a "statement of facts" containing her reasons

for filing the complaint.  *Id.*  In the "statement of facts," Porter recounted the BLM Conversation

and claimed that Chandler mischaracterized her comment about a pregnant co-worker in the 2020

Evaluation; assumed Porter had been complaining about her pregnant co-worker Kim Tucker; and

delayed in having the comment removed.  *Id.* at 9–11.  Porter also expressed concern about

Chandler "hold[ing] grudges" and creating a hostile work environment by "talking about [Porter]

to [her] co-workers."  (Filing No. 48-2 at 9–12.)  Porter stated that she has never complained about

a pregnant co-worker, but "if [she] wanted to complaint about something," she would have had

several complaints about holidays scheduling, scheduling changes, the co-worker's non-use of paid

time off ("PTO") for days off, Kim Tucker's assignment to a different facility, the frequency of

Porter's assignments to the ED, and general interpersonal conflicts between Porter and her co-workers.  *Id.* at 17–21.

HR Rep Rogers investigated Porter's First HR Complaint by interviewing Porter, Chandler, and several co-workers, and by requesting and reviewing documentation from Porter and Chandler (Filing No. 48-1 at 5; Filing No. 48-7 at 63).  HR Rep Rogers concluded that Porter's complaints were unsubstantiated, though she required Chandler to enroll in training classes to improve her communications skills (Filing No. 48-1 at 5).  HR Rep Rogers closed her investigation on April 26, 2021 by meeting with Porter and Chandler separately (Filing No. 48-2 at 5).

### 2.  **The June 2021 Dress Code Discussion**

On or around April 2021, the Franciscan Imaging Department changed its dress code to require employees to wear a gray or black jacket with a Franciscan logo (Filing No. 48-3 at 3).  On June 2, 2021, Director Brocker had a discussion with Porter about her non-compliance with the new dress code.  Director Brocker sent a follow-up email later that day, asking Porter to comply with the dress code by the next day.  *Id.*  Porter responded by explaining that she had delayed in ordering a new Franciscan jacket due to financial hardship, and the jacket was now on backorder. *Id.*  Director Brocker replied, stating she would attempt to find a pre-owned jacket for Porter to wear until her jacket arrived.  *Id.*  A few hours later, Porter told Director Brocker that she was able to borrow a jacket from someone else.  *Id.*

### 3.  **Porter's First and Second Disciplinary Reminders, Second HR Complaint, and First EEOC Charge**

Franciscan maintains a four-step Corrective Action Policy that governs discipline of all Franciscan employees: First Reminder; Second Reminder; Final Reminder; and Termination or Suspension pending Termination.  (Filing No. 48-4 at 2.)  Some types of violations, like attendance violations, follow a different corrective action track.  *Id.*  Porter received her First and Second

Reminders on January 26, 2022, at a meeting with Chandler, Supervisor White, and Co-Worker and Labor Relations Specialist Lisa Cody ("HR Rep Cody"). *Id.*

Chandler issued the First Reminder for a rule violation that occurred on December 30, 2021 ([Filing No. 48-1 at 5](#); [Filing No. 48-7 at 96](#)–98). Chandler's Corrective Action form states that Porter emailed Chandler on the evening of Tuesday, December 28, 2021, stating she would be leaving work early on Thursday, December 30, 2021 ([Filing No. 48-1 at 23](#)). Chandler had not approved Porter's request to leave early and was unable to find someone to fill in for Porter, but Porter left early on Thursday anyway. *Id.* at 5, 23.  Porter acknowledges that Chandler did not approve her request ([Filing No. 60-1 at 7](#)).  Chandler consulted Supervisor White at the HR Department before issuing the First Reminder, and HR Rep Cody agreed that corrective action was appropriate ([Filing No. 49 at 23](#)).

Supervisor White issued the Second Reminder because Porter's CT Technologist License was expired from January 17 to January 24, 2022 ([Filing No. 48-5 at 4](#)).  Porter does not dispute she was required to keep her license up-to-date and renew it before its expiration, nor does she dispute that her license had expired ([Filing No. 48-6 at 134](#)–35).

The day after receiving the First and Second Reminders, Porter filed her second internal complaint (the "Second HR Complaint"), claiming that she was being harassed and treated unfairly because of her husband and children's race ([Filing No. 48-4 at 2](#)).  Porter's Second HR Complaint alleged that while other employees were permitted to simply tell Chandler what hours they will work, Porter received a Reminder for doing so. *Id.* at 2–3.  Porter also claimed that Chandler placed her on the on-call schedule more frequently than others; that she was required to work more holidays than other CT department employees; and that an attendance-related corrective action she

received was incorrect because she had accumulated only 4.5 attendance points, and 6 points are required for corrective action. *Id.* at 3.

HR Rep Cody investigated the Second HR Complaint by interviewing Porter, Chandler, and several co-workers, and by requesting and reviewing documentation from Porter, Chandler, and Director Brocker (Filing No. 48-1 at 6). HR Rep Cody concluded that Porter's complaints were unsubstantiated. (Filing No. 48-4 at 3–5.) She closed her investigation on April 26, 2022, by meeting separately with Porter and Chandler. *Id.* at 5). On March 21, 2022, while HR Rep Cody's investigation was pending, Porter filed her first Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination (the "First EEOC Charge") (Filing No. 60-1 at 9).

### 4.   Porter's Medical Leave and Return to Work

On June 6, 2022, Porter began a medical leave of absence (Filing No. 48-1 at 6). During her leave, she was removed from the work schedule, and other employees filled in as needed. *Id.* On August 1, 2022, Porter returned from leave. *Id.* However, Chandler did not know that Porter planned to return that day. *Id.* Porter was not on the schedule, and someone was already filling in for her. *Id.* Chandler consulted Supervisor White and Franciscan's leave specialist, Ashley Tyler ("Tyler"), who told Chandler to send Porter home because she had not submitted her return-to-work paperwork. *Id.* Porter came back to work on August 2, 2022, when Tyler received the return-to-work paperwork. *Id.* (Filing No. 48-7 at 69–72).

### 5.   Porter's Final Reminder and Federal Lawsuit

On October 19, 2022, Supervisor White informed Chandler that a patient had filed a grievance for a delay in patient care involving Porter and two other CT Technologists, Ashwaq Alsaady ("Alsaady") and Brooklyn Lamar ("Lamar") (Filing No. 48-1 at 6–7, 30–31). Chandler investigated the grievance and received emails from Porter, Alsaady, and Lamar regarding the

incident. *Id.* at 7; (Filing No. 48-7 at 29–30).   Chandler summarized her conclusions in a

Corrective Action form:

1. On Oct 19th at 630 am a cardiac patient checked in, the 2 techs on duty at the time [Alsaady and Lamar] were not cardiac trained.
2. At 7am on Oct 19th [Porter] was the only cardiac tech on duty.
3. Shortly after 7am [Porter] was contacted by the other 2 techs on duty and alerted that there was a cardiac patient.
4. [Porter] told them to wait for the Supervisor ([Chandler]), that [Chandler] would scan the patient.
5. After several minutes [Porter] was again contacted by the techs in the main [CT Department] and told there was a cardiac patient, she again told them to wait for Supervisor ([Chandler]). Supervisor did not clock in until 9am on this day due to scheduled PTO in the morning.
6. The patient was not scanned until 7:45 am at which point he had been here for 1 hour and 15 min. The patient and his wife filed a grievance with service excellence.

(Filing No. 48-1 at 7, 34).  Porter acknowledges that approximately twenty minutes passed between

the time she was first asked to scan the patient and the time she scanned him (Filing No. 48-6 at

89). On October 31, 2022, Chandler issued Porter a Final Reminder due to the October 2022 delay

in patient care (Filing No. 48-1 at 7, 37–38).

In August 2022, the EEOC issued Porter a Determination and Notice of Rights (Filing No.

48-6 at 111).  On November 2, 2022, two days after receiving her Final Reminder, Porter initiated

this lawsuit alleging discrimination and retaliation in violation of Title VII (Filing No. 1).

**6.     Porter's Termination, Second EEOC Charge, and Amended Complaint**

Porter was terminated on January 6, 2023, following a verbal altercation involving Porter,

Alsaady, and another CT Technologist, Kelly Cogshell ("Cogshell") (Filing No. 60-1 at 14, ¶ 76).

Director Brocker witnessed the altercation (Filing No. 48-3 at 4). Porter was loading a cart for

Cogshell and putting her personal belongings away, while Cogshell was talking to Alsaady about

why she had not come down the ED earlier, to relieve Porter (who had a prescheduled appointment)

and Cogshell. (Filing No. 60-1 at 13). Ms. Porter did not slam the cart, slam doors or drawers or

throw anything, and she denies being an aggressor during the verbal altercation. *Id*. at 13-14.

Chandler was told about the altercation but was not present (Filing No. 48-1 at 7).  In her Affidavit,

Director Brocker states that on December 9, 2022, she was starting a patient's IV across the hall

from the Main CT Department control room[3] when she heard yelling coming from the control

room (Filing No. 48-3 at 4).  She went to the control room and saw Porter and Cogshell standing

on either side of Alsaady in a verbal altercation.  *Id.*  Director Brocker walked into the control

room, signaled a "time out," and directed the three women to have their conversation later.  *Id.*

HR Rep Cody investigated the December 9, 2022 incident (Filing No. 48-4 at 6).  She

interviewed Porter, Alsaady, Cogshell, and two other CT Technologists.  *Id.*  Supervisor White

summarized her conclusions about the incident in a Corrective Action form:

> Between 11:00a-11:30a both Michelle Porter and Kelly Cogshell left the ED and
> came to the main department. [Porter] and [Cogshell] left the ED unattended with
> 6 STAT exams ordered, according to an EPIC data report, to obtain supplies.
> [Porter] was seen by peers slamming doors. [Porter] and [Cogshell] stood at each
> side of a peer raising their voices in a confrontational manner, distracting the peer
> from the patient on their table. During this time, there were 9 outpatient exams to
> be done in the main department. During the confrontation, the receiving peer stayed
> calm and did not raise their voice in response.
>
> Shortly into the confrontation, the Director of Imaging [Brocker] was prepping a
> patient just outside the door in an adjacent bay. She could overhear loud voices, so
> went in to investigate. She called for a stoppage to the conversation and to return
> the attention to the patient on the table. During this confrontation a patient in the
> adjacent room overheard and made a comment to the employee assisting them.
> During this time patient care was delayed.

(Filing No. 48-4 at 51–52).  As a result of her investigation, HR Rep Cody recommended that

Porter and Cogshell receive corrective actions (Filing No. 48-4 at 6).  Because Porter had already

received three Reminders, the next step of her Corrective Action Policy was Termination. *Id*.

January 6, 2023, Director Brocker, Supervisor White, and Co-Worker and Labor Relations

---

[3] The CT control room is located near the CT scanners and contains the controls and screens for the scanners.  There is one CT control room in the ED CT Department and one in the Main CT Department (Filing No. 48-7 at 35–36).

Specialist Madonna Clager ("HR Rep Clager") met with Porter to inform her that her employment was being terminated (Filing No. 48-5 at 6, ¶ 26). Chandler was not involved in the decision to discipline Porter for the December 9, 2022 incident or the decision to terminate Porter (Filing No. 48-1 at 7; Filing No. 48-7 at 74).

On January 17, 2023, Porter filed a second Charge of Discrimination with the EEOC (Filing No. 21 at 2). Porter received a Determination and Notice of Rights on February 1, 2023, and on February 7, 2023, filed an Amended Complaint, which newly alleged that her termination was discriminatory and retaliatory (Filing No. 21).

Franciscan moves for summary judgment on all claims asserted in the Amended Complaint (Filing No. 48). Porter filed a response brief (Filing No. 61), and Franciscan filed its reply and a supporting designation of evidence (Filing No. 65; Filing No. 66). Porter then filed a surreply (Filing No. 73), which Franciscan moves to strike (Filing No. 74). The Motion for Summary Judgment and Motion to Strike are fully briefed and ripe for the Court's review.

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its

11

pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Porter, as the non-moving party and draws all reasonable inferences in her favor. *Griffin v. City of Milwaukee*, 74 F.3d 824, 827 (7th Cir. 1996). However, employment discrimination cases are "extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (citation and quotation marks omitted).

## III.   **DISCUSSION**

Porter claims that Franciscan terminated her because of her association with her husband, who is Black, and her bi-racial children, created hostile work environment, and retaliated by terminating her employment after she complained. Franciscan seeks summary judgment on Porter's race discrimination claim arguing the undisputed evidence – considered as a whole – shows that Porter was not subjected to any adverse employment action because of her association

with her family; that she has abandoned her hostile work environment claim; and the undisputed evidence shows that Franciscan followed its progressive discipline policy and terminated Porter's employment because of her rule violations and failure to uphold the Franciscan Mission. The Court will resolve Franciscan's Motion to Strike before addressing its Motion for Summary Judgment.

## A.   <u>Motion to Strike Surreply</u>

Local Rule 56-1(d) allows a party opposing summary judgment to file a surreply brief "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." S.D. Ind. L.R. 56-1(d). The "purpose for having a motion, response, and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, No. 09-cv-340, 2010 WL 1258052, at *2 (S.D. Ind. Mar. 25, 2010). "New arguments and evidence may not be raised for the first time in a reply brief. Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief." *Reis v. Robbins*, No. 14-cv-63, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015) (citations omitted). "Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response." *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019).

Federal Rule of Civil Procedure 12(f) allows the Court to "strike from a pleading an insufficient defense or redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are generally disfavored; however, "where . . . motions to strike remove unnecessary clutter from the case, they serve to expedite, not delay." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

Franciscan's reply brief challenges the admissibility of certain statements in Porter's Declaration (Filing No. 65 at 10).  Franciscan also supports its reply with newly designated evidence, including a second affidavit from HR Rep Cody and additional deposition excerpts (Filing No. 66 at 1).  Porter contends that she filed her surreply "to address [Franciscan]'s new evidence and its evidentiary objection." (Filing No. 73 at 1.)  However, almost none of the surreply relates to admissibility or the new evidence.  In fact, Porter does not cite the new evidence anywhere in her surreply.  *See generally id.*  Most of the surreply merely elaborates on the same arguments raised in Porter's response.  *See generally* (Filing No. 61; Filing No. 73).  However, in Section II(B), Porter rebuts Franciscan's reply argument that she has abandoned her hostile work environment claim, and in Section II(D), she rebuts Franciscan's objections to the admissibility of paragraph 77 of her Declaration.  The Court always tries to "allow litigants a full and fair opportunity to respond to arguments made by their adversary, including allowing surreplies." *Roe v. Target Corp.*, No. 11-cv-0555, 2012 WL 3257891, at *21 (S.D. Ind. Aug. 8, 2012).  Franciscan's waiver arguments were "technically, new to its reply," and Porter's arguments on Franciscan's evidentiary objection are properly raised on surreply.  The Court will therefore not strike those two sections.  However, the Court agrees with Franciscan that the rest of Porter's Surreply does not comport with Local Rule 56-1(d).  The majority of the Surreply "is either a rehash of previously made arguments or an attempt to point out supporting facts for the claims [Porter] contends [s]he did not waive, which is an effort that properly belonged in [her] response brief." *Id*.

Accordingly, Franciscan's Motion to Strike is **granted in part and denied in part**.  The Motion to Strike is **denied** as to Sections (II)(B) and (II)(D) but is otherwise **granted**.  The surreply—other than Sections (II)(B) and (II)(D)—is **stricken** from the summary judgment record and will not be considered by the Court.

**B.**     **Motion for Summary Judgment**

The Court will address Porter's al claims of race discrimination, hostile work environment, and retaliation in violation of Title VII, in turn.

**1.**     **Race Discrimination**

Title VII prohibits employment discrimination based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  "Race discrimination claims under Title VII simply require that race be a 'motivating factor in the defendant's challenged employment decision.'" *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). "[T]he ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected status] caused the discharge or other adverse employment action."  *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself— or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765. But as a means of "organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," courts employ the well-known burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Under *McDonnell Douglas*, a plaintiff must "make a *prima facie* case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020).  To make a *prima facie* case, a plaintiff must show: (1) she belongs to a protected class; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly

15

situated employee outside of her protected class received better treatment from the employer. *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020).

Franciscan argues that Porter cannot make a *prima facie* case of race discrimination because she was not meeting Franciscan's legitimate expectations and similarly situated employees were not treated more favorably than her. Franciscan also argues it can show legitimate, non-discriminatory reasons for its actions, which Porter cannot show are pretextual. In her response, Porter argues that there is a mosaic of circumstantial evidence from which a reasonable jury could infer that Franciscan discriminated against her. More specifically, she cites evidence of suspicious timing, ambiguous statements, evidence that similarly situated employees received more favorable treatment, and evidence showing that the legitimate reasons for her Final Reminder and Termination were pretextual. *Id.* at 25.

The Court finds that the more holistic approach under *Ortiz* is better suited to addressing Porter's arguments than the *McDonnell Douglas* framework. The Court will therefore address each type of evidence on which Porter relies and determine whether this evidence, when considered as a whole, would permit a reasonable factfinder to conclude that Porter's association with her biracial family motivated the alleged adverse employment actions.

    a.    **Suspicious Timing**

As to timing, Porter argues that before the BLM Conversation, Chandler had given Porter "glowing performance evaluations." (Filing No. 61 at 33–34.) The fact that Chandler gave Porter a poor review after the BLM Conversation, "shortly before the end of the 2020 rating period," shows a discriminatory motive.

The timing of Porter's 2020 Evaluation--delivered on January 12, 2021 evaluating Porter's performance for the period of August 1, 2019 to July 31, 2020--does not support an inference of discrimination for three reasons. First, the June 2020 BLM Conversation and 2020 Evaluation

were too far apart to suggest discriminatory intent.  Even though the 2020 Evaluation was the first evaluation that Porter received after the BLM Conversation, the two incidents occurred seven months apart.  *May v. Heart of Cardon, LLC*, No. 22-CV-433, 2023 WL 5795224, at \*10 (S.D. Ind. Sept. 7, 2023) ("[T]he Seventh Circuit has considered comments made two to three months before the adverse employment action to be too remote in time to raise an inference of discrimination.").  Further, the fact that Chandler gave Porter excellent evaluations in 2017, 2018, and 2019 cuts against Porter's theory of discrimination, since Chandler knew that Porter was married to a Black man and had bi-racial children when she gave those earlier evaluations.  The only intervening incident between the "glowing" evaluations and the 2020 Evaluation was the BLM Conversation, but Porter does not allege discrimination on the basis of her association with the BLM movement; she alleges discrimination on the basis on her association with her husband and children.  Because Chandler gave Porter three years' worth of "glowing" evaluations while knowing that Porter had a Black husband and biracial children, no reasonable jury could infer that the 2020 Evaluation was based on Porter's association with her husband and children.

Second, the 2020 Evaluation itself is not an adverse employment action.  *See Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.1998) (declining to broaden the definition of adverse employment action to include reprimands that were not accompanied by a tangible job consequence).  The Seventh Circuit has repeatedly held that negative performance evaluations alone do not constitute adverse employment actions.  *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996).  The first arguable adverse employment actions were Porter's First and Second Reminders, which were issued in January 2022, roughly nineteen months after the BLM Conversation.

Third, Franciscan has shown legitimate, non-discriminatory reasons for Porter's poor 2020 Evaluation, First Reminder, and Second Reminder.  In her evaluation form, Chandler explained

that she received multiple complaints about Porter's attitude and behavior.  This explanation is made credible by Porter's own statements.  During her deposition, Porter explained that 2020 was a "very exhausting" and "very stressful" time for CT Techs due to the COVID-19 pandemic (Filing No. 48-6 at 53; Filing No. 49 at 22).  Porter's HR Complaints confirmed that she harbored several frustrations with Franciscan (Filing No. 48-2 at 17–21 (listing things that Porter had not but "would" complaint about)).  After receiving the 2020 Evaluation, Porter vigorously disputed (and continues to dispute) that she made a disparaging comment about a pregnant co-worker (Filing No. 61 at 6).  But it does not matter whether Porter actually made those comments, or whether Chandler could have better investigated the complaints about Porter's attitude.  "[E]ven where a plaintiff . . . alleges that 'the company's investigation was imprudent, ill-informed and inaccurate,' summary judgment is appropriate unless the employee 'could point to facts suggesting the company investigated [her] differently'" because of her protected status.  *Biolchini v. Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999); *see Stockwell v. City of Harvey*, 597 F.3d 895, 901–02 (7th Cir. 2010) ('[C]ourts are not 'superpersonnel department[s]' charged with determining best business practices." (second alteration in original)).  What matters is whether Chandler genuinely believed that Porter did not uphold the Franciscan Values.  Based on the undisputed material facts, she did.

The timing between the BLM Conversation and the First and Second Reminders is even more remote.  But Franciscan also provided non-discriminatory reasons for those corrective actions.  As to the First Reminder, Porter does not dispute that she left work early without Chandler's approval (though she disputes whether affirmative approval, rather than tacit approval, was needed).  And as to the Second Reminder, Porter does not dispute that she let her license expire.  The First and Second Reminders were issued in close proximity to the proffered reasons

for those corrective actions, and more than a year after the BLM Conversation.  Additionally, the fact that HR Rep Cody (who did not participate in the BLM Conversation) agreed that the First Reminder was appropriate, and the fact that Supervisor White (who did not participate in the BLM Conversation) issued the Second Reminder, show that Franciscan disciplined Porter for the proffered reasons and not because of Chandler's racial bias (Filing No. 49 at 23).

### b.    Ambiguous Statements and Other "Bits and Pieces"

Porter next argues that comments made by Chandler during and after the BLM Conversation show a discriminatory intent.  During the BLM Conversation, Chandler asked Porter "why she would want to [attend the protest], someone is just going to get shot," and said "I can't believe you're going to that."  Chandler also said she "did not want to hear about it and was 'sick and tired of it all,'" and "that **her** son was scared to go outside, and the protests were affecting **her** family, even though she did not have a black husband or bi-racial children." (Filing No. 61 at 34 (emphasis in original)).  However, these statements relate to the Black Lives Matter movement and the safety of protest participants, not Porter's family or other people of color.  At most, the statements show that Chandler did not fully appreciate the purpose or significance of the Black Lives Matter protests, or the systemic problems affecting people of color in the United States. They do not show the type of discriminatory animus required to succeed under Title VII.  The fact that Chandler did not coach Porter or have any conversations with her before the First Reminder likewise lacks any connection to Porter's protected status. Chandler testified that she did not typically offer informal coaching, so she did not deviate from the norm by declining to have those conversations with Porter.  (Filing No. 48-7 at 28.)

Porter also contends that Chandler made other comments after the BLM Conversation that support her discrimination claim.  Chandler "took issue with the fact that some of the CT Techs wanted to discuss racism and what was going on in the country.  Chandler did not want to come

into work every morning and 'have a debate.'" (Filing No. 61 at 34 (quoting Filing No. 60-3 at 40–42)).  Two CT Techs (one who is white and one who is Black) "were discussing racism during that time and Chandler told them to stop because 'people' were complaining." *Id.* (Filing No. 61 at 34 (quoting Filing No. 60-3)).   In addition to being ambiguous, these comments were not contemporaneous with any adverse employment action and do not demonstrate any connection to any adverse employment actions.  "[I]solated comments are not probative of discrimination unless they are 'contemporaneous with the [employment action] or causally related to the . . . decision-making process." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997)).

Porter fails to raise any genuine dispute as to the material fact that Chandler genuinely based the 2020 Evaluation, the First Reminder, or the Second Reminder for the reasons stated in the 2020 Evaluation and corrective action forms.  The BLM Conversation and ambiguous comments by Chandler all occurred several months before any arguable adverse employment action, and they have no apparent causal connection to any adverse employment actions.  That evidence does not raise a genuine dispute as to discriminatory intent.  *See McClendon v. Ind. Sugars, Inc.* ("*McClendon*") 108 F.3d 789 (7th Cir. 1997) (concluding timing of plaintiff's termination for insubordination three days after filing a discrimination lawsuit was insufficient to show pretext in light of undisputed evidence employer honestly believed plaintiff was disrespectful in two meetings with superiors a week before and the day of his termination).

### c.   Similarly Situated Employees

Porter argues that similarly situated co-workers who engaged in the same conduct were treated more favorably with respect to her First Reminder (for taking time off without approval) and Second Reminder (for her license expiration).  (Filing No. 61 at 34–35.)

The similarly-situated analysis calls for a "flexible, common-sense" examination of all relevant factors. All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The "similarly situated" prong establishes whether all things are in fact equal. Its purpose is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus.

Similarly situated employees must be "directly comparable" to the plaintiff "in all material respects," but they need not be identical in every conceivable way. We are looking for comparators, not "clones." So long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied.

*Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citations and quotation marks omitted). The Seventh Circuit further explained in *Coleman*,

In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. This is not a "magic formula," however, and the similarly-situated inquiry should not devolve into a mechanical, "one-to-one mapping between employees."

*Id*. at 847 (citations and quotation marks omitted).

Chandler issued the First Reminder because Porter left work early on December 30, 2021 without prior approval.  On December 28, 2021, Porter emailed Chandler stating "I need to leave early this Thursday at 1330. Sorry for the short notice." (Filing No. 60-1 at 73). Porter asserts that two of her co-workers, Laura Thomas ("Thomas") and Nate Nichols ("Nichols"), sent similar messages to Chandler without repercussions.

Thomas is white, and her family is white, which means that Thomas falls outside Porter's protected class for purposes of her race discrimination claim (Filing No. 48-6 at 92). However, as Porter acknowledged in her deposition, Thomas' requests to leave early were approved by Chandler.  The text messages between Thomas and Chandler confirm as much.  *Id.*; (Filing No.

60-7 at 29–30).   Porter and Thomas' situations are therefore not comparable; Thomas had permission to leave work early, and Porter did not.

Porter next offers evidence that Nichols is white and does not have bi-racial children. However, the record is silent as to whether Nichols has a Black partner (who may have Black or biracial children) or otherwise associates with Black persons.  For that reason, Porter has failed to demonstrate that Nichols falls outside her protected class.  (Filing No. 60-1 at 15); *see, e.g.*, *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) ("The record does not disclose the age of a handful of the other employees, so it is impossible to know whether or not they are members of [plaintiff's] protected class."); *Ballard v. Potter*, No. 02-CV-498, 2005 WL 8170067, at *9 n.3 (N.D. Ind. Mar. 22, 2005) ("Ballard presents no evidence of Wooten's age or race.  Thus, it is impossible to know whether Wooten was outside of any of Ballard's protected classes."); *Keiju Pu v. Columbia College Chicago*, 934 F. Supp. 2d 964, 972 (N.D. Ill. 2013) ("Pu does not provide the ages of Beasley, Manning, or Kapoor.  Instead, Pu states only that Kapoor was 40-years-old at the time she was hired.  Thus, Pu cannot demonstrate that these employees are members of her protected class.").  Moreover, the text messages between Nichols and Chandler show that Chandler approved Nichols' request to leave early.   For both of those reasons, Nichols is not a proper comparator.

The Second Reminder was issued because Porter's license had expired.  In her Declaration, Porter states that on January 16, 2023, she looked at the license database maintained by the State of Indiana and saw that Nichols license expired on January 7, 2023. (Filing No. 60-1 at 14).  Porter argues that Nichols' license had also expired, but Chandler "apparently caught it and told [him] it was due," so he "paid the dues and never heard anything."  (Filing No. 60-1 at 124.)  Neither Porter's Declaration nor the messages between Porter and Ms. Nichols clarify whether Chandler

"caught" that Nichols' license was *about to* expire and failed to check whether he timely renewed his license; or whether she "caught" that the license had *already* expired and failed to discipline him.[4]   It is therefore unclear whether Nichols received more favorable treatment than Porter. Regardless, Nichols is not a proper comparator for two reasons. First, Supervisor White noticed that Porter's license had expired and issued the Second Reminder, whereas Chandler "caught" that Nichols' license was "due." (Filing No. 60-1 at 7; Filing No. 48-5 at 3–4; Filing No. 60-1 at 124.) The fact that Porter and Nichols dealt with different supervisors (with respect to the licenses) is particularly significant in this case, since there is no evidence that Supervisor White harbored any racial animus; Porter's race discrimination claims are focused squarely on Chandler.  Second, and more importantly, Porter has failed to show that Nichols falls outside her protected class because she has not offered any evidence showing that Nichols does not have an association with Black persons.

Porter has not identified any similarly situated employee outside her protected class who, under similar circumstances, received more favorable treatment than her with respect to either the First Reminder or Second Reminder, or any other alleged adverse employment actions.

### d.   <u>Pretext for Final Reminder and Termination</u>

Porter lastly argues that Franciscan's proffered non-discriminatory reasons for her Final Reminder (the October 2022 delay in patient care) and for her Termination (the December 2022 verbal altercation) are pretextual (Filing No. 61 at 35).  As to the Final Reminder, Porter disputes Chandler's versions of events, contends that her conduct did not warrant discipline (since she "would have been delaying patient care and abandoning her post" if she had responded to the complaining patient), and argues that Chandler accepted false statements and ignored statements

---

[4] Ms. Chandler testified that she received automated "e-mails when somebody's getting close to an expiration" but does not "have anything to do with, like, making sure [licenses] don't expire." (Filing No. 60-3 at 25–26).

that would have corroborated Porter's version of events (Filing No. 61 at 30).  These arguments are insufficient to withstand summary judgment.

When evaluating a plaintiff's evidence of pretext, "it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was . . . a lie." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (internal quotation marks omitted).  To meet this burden on summary judgment, a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937–38 (7th Cir. 2022) (internal quotations omitted) (quoting *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021)).

Chandler's report about the October 2022 delay in patient care is not "factually baseless" or so unbelievable, such that it shows pretext.  The crux of Chandler's report is undisputed—Porter was called to respond to the patient and delayed in attending to that patient and the patient complained to the hospital about the delay in care. (Filing No. 48-1 at 8; Filing No. 60-1 at 10–11).  Porter disputes *why* the delay occurred, but those disputes are immaterial.  Regardless of whether Chandler was mistaken as to why Porter did not respond more quickly, regardless of whether she conducted a poor investigation of the incident by unfairly weighing witness statements, and regardless of whether her decision to deliver a Final Reminder was unfair or unwise, the undisputed facts show that Chandler gave Porter her Final Reminder because she genuinely believed that Porter delayed patient care.  *See Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 –63 (7th Cir. 2016) ("Although Simpson disputes the accuracy of the accusations leading to the reprimands, the relevant inquiry is whether the stated reason for an adverse action

is in fact the reason for that action, not whether the action was free of mistake or even fair.  Simpson offered no evidence to show that [the supervisor] lied in any of the reprimands or that the events documented in the reprimands are not what caused [the supervisor] to discharge Simpson. Instead, Simpson simply speculates that Kelly's reasons could be pretextual, and that speculation is insufficient.").

Porter has likewise failed to raise a genuine dispute of material fact as to whether the actual reason for her Final Reminder was discriminatory.  *See Perez v. Illinois*, 488 F.3d 773, 777–78 (7th Cir. 2007) ("[T]he plaintiff must show that the employer's reason is not credible or that the reason is factually baseless.  'The plaintiff must *also* provide evidence of at least an inference that the real reason for the adverse employment action was discriminatory.'" (cleaned up) (emphasis added) (quoting *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999))).  Nothing ties Porter's protected status to her Final Reminder other than a brief conversation about Black Lives Matter that occurred two and a half years earlier. (Filing No. 61 at 34).  That is not enough to create a reasonable inference of discrimination.  *See, e.g.*, *Overly v. Keybank Nat'l Ass'n*, 662 F.3d 856, 864 (2011) ("Ultimately, this evidence is only speculation that the conduct was the result of gender discrimination and reliance on speculation is not enough to get the case to a jury.")).

As to her Termination, Porter again disputes what actually happened during the December 2020 verbal altercation (Filing No. 61 at 31–33).  But like Franciscan's reason for the Final Reminder, the proffered reason for the Termination is not unbelievable.  The basic facts underlying the Termination are undisputed—Porter and Cogshell both left the ED CT Department, leaving the Department unattended with patients waiting; Porter and Cogshell entered the control room and spoke with Alsaady; and Director Brocker told them to stop (Filing No. 48-4 at 6, 48; Filing No. 61 at 31).  The proffered reason for Porter's termination is also consistent with interviews from

Director Brocker, Cogshell, and Alsaady, and, for the most part, Porter's interview ([Filing No. 48-4](); *id.* at 40–42).   At most, Porter has shown that Franciscan's conclusions about the verbal altercation were mistaken, and its decision to terminate Porter was ill-advised and unfair.   More is needed to withstand summary judgment.   *See Collins v. Am. Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013) ("Title VII does not forbid sloppy, mistaken, or unfair terminations; it forbids discriminatory or retaliatory terminations."); *see Ineichen*, 410 F.3d at 961 (holding that defendant was entitled to summary judgment because plaintiff failed to present any evidence that defendant's proffered reason was a lie); *see also Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696–97 (7th Cir. 2006) (demonstrating summary judgment is appropriate where termination is made for "legitimate, job-related reasons," even with evidence of more favorable treatment to other employees or hostile or derogatory comments "unrelated" to the termination) (collecting cases).

More importantly, there is no evidence that the actual reason for Porter's Termination was discriminatory.   *See Perez*, 488 F.3d at 777–78.   Chandler was not involved in the decision to terminate Porter, and there is no evidence whatsoever from which a reasonable jury could infer that individuals who did make the decision were motivated by discrimination.

### e.   <u>Consideration of All Circumstantial Evidence</u>

Based on the totality of the evidence, no reasonable jury could infer that Porter's corrective Reminders or Termination were caused by her association with her Black husband or bi-racial children. Porter offers scant evidence of discrimination, including, the BLM Conversation that occurred almost a year before the First Reminder; ambiguous statements that were not contemporaneous with any adverse employment action; and Porter's own statements disputing what in fact occurred during the October 2022 delay in patient care and December 2022 verbal altercation.   Porter's very limited evidence does not create a genuine dispute of material fact as to discriminatory intent where a wealth of evidence demonstrates a clear causal connection between

Franciscan's proffered, non-discriminatory reasons and the 2020 Evaluation, Reminders, and Termination.  Based on the undisputed material facts, no reasonable jury could conclude that Franciscan discriminated against Porter on the basis of her association with her husband or children.  Accordingly, the Court **grants** Franciscan's Motion for Summary Judgment as to Porter's race discrimination claim.

### 2.   Hostile Work Environment

In its opening brief, Franciscan argues it is entitled to summary judgment on Porter's hostile work environment claim because the conduct identified in Porter's Amended Complaint is not tied to her association with her family, nor is it sufficiently severe or pervasive. The Amended Complaint identifies as alleged harassment: the BLM Conversation; the 2020 Evaluation; Porter's progressive discipline; the June 2021 dress code incident; Porter's return from medical leave; and Franciscan's on-call, holiday, flex-time, and time-off policies (Filing No. 21 at 4–7).

In her response, Porter fails to respond to Franciscan's arguments or even mention her hostile work environment claim.  On reply, Franciscan argues that Porter has abandoned that claim (Filing No. 65 at 13).  When a party fails to respond to an issue raised in a summary judgment motion or fails to raise the claim in the response brief, the issue or claim is deemed waived.  *Hobbs v. Am. Com. Barge Line LLC*, No. 22-CV-00063, 2023 WL 8086665, at *6 (S.D. Ind. Nov. 21, 2023) (citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003).  In her surreply, Porter argues that she did not abandon her hostile work environment claim because her response brief cited evidence that would support her claim (Filing No. 73 at 7).

The Court tends to agree with Franciscan.  A summary judgment non-movant does not address a claim by merely citing evidence that *could* support that claim; the respondent must cite that evidence and offer some argument as to how that evidence supports her claim.  *Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) ("It is not the obligation of this court to research and

construct the legal arguments open to parties, especially when they are represented by counsel."). In *Tedrow v. Franklin Township Community School Corp.*, 674 F. Supp. 3d 494, 527 (S.D. Ind. 2023), this Court found that a plaintiff abandoned his hostile work environment claim by offering similarly underdeveloped arguments.  At minimum, Porter waived her opportunity to respond to Franciscan's arguments.  At most, she has abandoned her claim.

But even if Porter has not abandoned her hostile work environment claim, the claim is still subject to dismissal because the evidence does not demonstrate any connection between the complained-of conduct and Porter's protected status.  A plaintiff alleging a hostile work environment must show: (1) she was subject to unwelcome harassment; (2) the harassment was based on her race (or the race of those with whom she associates); (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability.  *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018).

As the Court explained above, Porter has not offered sufficient evidence connecting her 2020 Evaluation, Reminders, or Termination to her association with her husband and children. Likewise, there is simply no evidence showing a causal nexus between Porter's protected status and her dress code discussion with Director Brocker or her attempt to return from medical leave. There is absolutely no evidence that either Director Brocker, Supervisor White, or Tyler had any discriminatory intent in discussing the dress code violation or deciding that Porter could not return from medical leave (Filing No. 65 at 10).  The lack of causal nexus is made more apparent by the evidence of the legitimate reasons for these actions—namely, Porter's failure to comply with the Franciscan dress code, and her failure to notify Franciscan of her return from leave or provide

appropriate paperwork.  To the extent these incidents constitute harassment, no reasonable jury could conclude that they were based on Porter's protected status.[5]

Based on the undisputed material facts, no reasonable jury could find in Porter's favor on her hostile work environment claim.  For that reason, the Court **grants** Franciscan's Motion for Summary Judgment as to Porter's hostile work environment claim.

### 3.    Retaliation

"To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) [s]he engaged in an activity protected by the statute; (2) [s]he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action."  *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citation omitted).  Franciscan does not dispute that Porter engaged in protected activity or suffered an adverse employment action.  Franciscan instead argues that there is no "causal link" between the two, and the Court agrees.

The same standards of proof apply to Title VII retaliation claims and discrimination claims. "To determine whether [a] retaliation claim should survive summary judgment, [courts] ask whether the evidence produced would permit a reasonable factfinder to conclude the plaintiff's [protected status] caused the discharge."  *Swyear v. Fare Foods Corp.*, 911 F.3d 874 (7th Cir. 2018) (citing *Ortiz*, 834 F.3d at 765).  Porter's retaliation claim largely relies on the same evidence offered in support of her discrimination claim, so her retaliation claim fails for similar reasons.

### a.    Suspicious Timing

Porter first argues that the timing of her disciplinary reminders and termination is suspicious.  Occasionally, very close timing between a protected activity and adverse employment

---

[5] Ms. Porter also cites a February 2021 email from HR Rep Rogers stating, "I have two coworkers who cannot get along and it is mostly based on race discrimination." (Filing No. 73 at 7; Filing No. 60-6 at 19).  Ms. Porter does not explain the relevance of this email to her hostile work environment claim. Because the email was not sent to Ms. Porter, the Court does not see how it has any relevance.

action, without more, may support an adverse inference by a factfinder.  *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011); *see Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013) (finding that suspicious timing combined with evidence of political motivations to terminate plaintiff created a triable issue of fact).  However, "suspicious timing alone is rarely enough to survive summary judgment particularly when there are reasonable, non-suspicious explanations for the timing of the termination." *McCann v. Badger Mining Corp.*, 965 F.3d 578 (7th Cir. 2020) (quotation marks and citations omitted).

Porter states that Chandler "initiat[ed] . . . the corrective action process" by issuing the First and Second Reminders "after [Porter] had already made her First Complaints," and that Chandler issued the Final Reminder "after [Porter's] Second Complaint and EEOC Charged had been filed." (Filing No. 61 at 25–26.)  Porter lodged her First HR Complaint in February 2021 (Filing No. 60-1 ¶¶ 25-26).  The First and Second Reminders were issued almost a year later, in January 2022. *Id.* ¶ 40.  The timing between the two events is not close.  "Very close" timing between protected activity is typically "no more than a few days." *Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 573 (7th Cir. 2021) (quoting *Loudermilk*, 636 F.3d at 315); *see Jackson v. Delaware Cnty. Sheriff's Dep't*, No. 1:17-cv-03248-JPH-MJD 2020 WL 564311, at *4 (S.D. Ind. Feb. 5, 2020) ("[T]he fact that an adverse action occurred sometime after protected activity does not establish causation.") (citing *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006)). The fact that the First and Second Reminders were issued only a few weeks after Porter left work early without permission, and mere days after Chandler learned that Porter's license had expired, shows that the First and Second Reminders were issued for non-discriminatory reasons (Filing No. 60-1 at 7 ¶¶ 39–40).

The gap between the Second HR Complaint and First EEOC Charge (January and May 2022) and the Final Reminder (October 2022) is also too great to support an inference of

retaliation, particularly in light of the undisputed evidence that Porter (for one reason or another) delayed in attending to a cardiac patient shortly before the Final Reminder.  *See Bless*, 9 F.4th at 573 (stating that "an error alone does not show pretext," and that a plaintiff must show both pretext and that retaliatory animus motivated the adverse action).

### b.     <u>Ambiguous Statements and Other "Bits and Pieces"</u>

Porter also contends that a reasonable jury could infer retaliatory intent from Chandler's reactions to Porter's protected activity, Director Brocker's ambiguous comments, and HR Reps Cody and Clager's superficial investigation into the December 2022 verbal altercation.  (<u>Filing No. 61 at 26</u>–27.)

Porter states that Chandler was "upset with the Second HR Complaint and thought 'you've got to be kidding me,'" the First EEOC Charge was "'kind of ridiculous,'" and that this lawsuit was "'like beating a dead horse.'"  (<u>Filing No. 61 at 27</u> (quoting <u>Filing No. 48-7 at 66</u>, 69, 123).) Chandler also testified that she thought Porter's termination "would finally put an end to 'all of this ridiculousness.'"  *Id.* (quoting <u>Filing No. 48-7 at 79</u>).  Chandler's comments do not permit a reasonable inference of retaliation.  In addition to being ambiguous, these comments were not contemporaneous with any adverse employment action and do not demonstrate any connection between the comments and the adverse employment actions.  *Fleishman*, 698 F.3d at 605. Chandler's reaction to Porter's First HR Complaint, made in February 2021, occurred eleven months before Porter's First and Second Reminders, and Chandler's reaction to the Second HR Complaint and First EEOC Charge occurred at least seven months before the Final Reminder. *Id.* (finding that ten months was not contemporaneous with termination); *Markel v. Bd. of Regents of Univ. of Wis. Sys.,* 276 F.3d 906, 910–11 (7th Cir. 2002) (finding that two months before termination was not contemporaneous); *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722 (7th Cir. 2008) (finding that three months was not contemporaneous); *Kennedy v. Schoenberg, Fisher*

*& Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998) (finding that five months was not contemporaneous).

Porter also fails to explain how Chandler's reactions and comments relate to Franciscan's decisions to issue the First, Second, or Final Reminder, "when the record reflects a clear, causally connected chain of events" tying each of those Reminders to Porter leaving work early without approval, letting her license expire, and delaying patient care, respectively.  The connection between the comments/reactions and the Second Reminder is even more tenuous because Supervisor White, not Chandler, issued the Second Reminder.  Porter similarly fails to show any causal nexus between Chandler's comments regarding this lawsuit or Porter's termination; there appears to be no such nexus, since Chandler was not involved in the termination decision. *Gleason*, 118 F.3d at 1140 ("[T]here is not even arguably a 'causal link' between Novak's supposed bias against pregnant women and the plaintiff's termination, *for Novak did not participate in the decision to terminate Gleason*.  Thus, Novak's comments . . . are essentially irrelevant to the question of whether pregnancy was a factor in the plaintiff's termination." (emphasis in original)).

Porter next argues that retaliatory intent can be inferred from a December 13, 2022 email from Director Brocker stating that she "can't continue being silent on a situation that is 2 years in the making in imaging."  (Filing No. 61 at 27 (quoting Filing No. 60-5 at 44)).  Although this statement is arguably contemporaneous with Porter's Termination and, by Director Brocker's own admission, relates in part to Porter's HR Complaints and EEOC Charge, it does not evidence Franciscan's retaliatory intent because Director Brocker did not make the decision to terminate Porter.  *Gleason*, 118 F.3d at 1140.

Porter lastly argues that "Brocker, White and Chandler knew Porter filed her lawsuit on November 2, 2022, and despite the fact that the December 9 confrontation between Cogshell and

Alsaady did not involve Porter, all three—Brocker, White, and Chandler—wanted her terminated."
(Filing No. 61 at 27.)  Regardless of what actually occurred that day, "Franciscan was going to use
the December 9 confrontation between Cogshell and Alsaady to terminate Porter." *Id.*  In support
of this argument, Porter asserts that "Cody and Clager began working on the final corrective action
on December 20, 2022," even though they "did not speak to Porter until December 23, 2022," the
same day that "Cody emailed HR leadership the termination request." *Id.*  Porter also notes that
"Cody did not speak to Cogshell until January 3, 2023," and "the majority of the conversation
focused on Porter and not Cogshell." *Id.* at 27–28.

This evidence again does not support a reasonable inference of retaliatory intent. Neither
Brocker, Supervisor White, nor Chandler made the decision to terminate Porter's employment.
The fact that Porter was not terminated until January 6, 2023—after HR Reps Cody and Clager
had spoken with everyone involved (Cogshell, Alsaady, Ms. Lassere, CT Tech Nick Penniston,
and Porter)—further undercuts Porter's argument that she would have been terminated regardless
of the results of the investigation.  The evidence shows, at most, that HR Reps Cody and Clager's
investigation was inadequate or incomplete, and their decision to request approval for termination
was premature.  That is insufficient to show retaliatory intent.

### c.    Similarly Situated Employees

Porter contends that her co-workers were treated more favorably in regard to the First and
Second Reminders (Filing No. 61 at 28).  Like with her race discrimination claim, Porter identifies
Thomas and Nichols as comparators.  However, Porter fails to show that either of these individuals
fall outside her protected class for purposes of her retaliation claim. There is no evidence that
Thomas or Nichols never engaged in protected activity.  *See, e.g.*, *Boss v. Castro*, 816 F.3d 910,
918 (7th Cir. 2016) (requiring the plaintiff to show "he was treated less favorably than similarly-
situated employees who did not engage in protected activity" to show *prima facie* retaliation);

*Keller v. Ind. Family & Soc. Servs. Admin.*, 639 F. Supp. 2d 928, 945 (S.D. Ind. 2009) ("Plaintiffs must establish that they were treated less favorably than similarly situated employees who did not engage in protected activity.").  "The purpose of the 'similarly-situated' comparator is to ensure that all other variables are discounted so that discrimination can be inferred. . . . [I]t at least requires that the plaintiff name a comparator outside her protected class." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012).  Neither Thomas nor Nichols is a proper comparator for Porter's retaliation claim.  Additionally, as the Court has already explained, Thomas and Nichols left work with Chandler's prior approval, which distinguishes their conduct from Chandler's conduct.

### d.  Pretext for the Third Reminder and Termination

Porter claims that Franciscan's stated reasons for both the Third Reminder Corrective Action and Termination are pretextual (Filing No. 61 at 30).  Porter asserts the same pretext arguments in support of her race discrimination claim and retaliation claim (Filing No. 61 at 35 (citing § IV(B)(3))).  The Court fully addressed Porter's pretext arguments in discussing her race discrimination claim, and for the same reasons, Porter has failed to show that Franciscan's reasons for the Final Reminder and Termination were pretextual.

### e.  Consideration of All Circumstantial Evidence

Considering all the evidence as a whole, no reasonable jury could infer that Porter's alleged adverse employment actions were caused by retaliation.  Porter cites only ambiguous statements that were either not contemporaneous with any adverse employment action or not made by a decisionmaker.  This evidence is insufficient to create a reasonable inference of retaliation in light of the ample evidence demonstrating a causal connection between Franciscan's legitimate proffered reasons and any alleged adverse employment action.  Accordingly, the Court **grants** summary judgment in favor of Franciscan on Porter's retaliation claim.

## IV.   <u>CONCLUSION</u>

For the reasons discussed above, the Court **GRANTS in part and DENIES in part** Franciscan's Motion to Strike Plaintiff's Surreply (Filing No. 74).  Porter's Surreply (Filing No. 73)—except Sections (II)(B) and (II)(D)—is **STRICKEN** from the summary judgment record. Further, the Court **GRANTS** Franciscan's Motion for Summary Judgment (Filing No. 48).

Final judgment shall issue under separate order.

**SO ORDERED**.

Date:   9/16/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kimberly D. Jeselskis
JESELSKIS BRINKERHOFF AND JOSEPH LLC
kjeselskis@jbjlegal.com

Amy Joan Adolay
KRIEG DEVAULT LLP (Carmel)
aadolay@kdlegal.com

Elizabeth Marie Roberson
KRIEG DEVAULT LLP (Carmel)
eroberson@kdlegal.com